294 N.J. Super. 158 (1996)
682 A.2d 1207
EAST PENN SANITATION, INC., PLAINTIFF-RESPONDENT,
v.
GRINNELL HAULERS, INC., SUSSEX COUNTY MUNICIPAL UTILITIES AUTHORITY, AND PETER COFRANCESCO, JR., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued May 6, 1996.
Decided September 26, 1996.
*161 Before Judges PETRELLA, SKILLMAN and P.G. LEVY.
Marc J. Friedman argued the cause for appellants Grinnell Haulers, Inc. and Peter Cofrancesco, Jr. (Rich & Friedman, attorneys; Mr. Friedman, of counsel and on the brief).
Sharon Handrock Moore argued the cause for appellant Sussex County Municipal Utilities Authority (Gebhardt & Kiefer, attorneys; Ms. Moore, of counsel; Patricia S. Colabella, on the brief).
Nicholas I. Filocco argued the cause for respondent (Waters, McPherson, McNeill, attorneys; David A. Waters and Mr. Filocco, of counsel; James J. Seaman and Matthew Malfa, on the brief).
Rachel Boylan, Deputy Attorney General, argued the cause for amicus curiae Department of Environmental Protection (Deborah T. Poritz, Attorney General, attorney; Ms. Boylan, on the brief).
The opinion of the court was delivered by SKILLMAN, J.A.D.
These are consolidated appeals from a judgment memorializing a jury verdict awarding plaintiff $1,875,000 in compensatory damages for tortious interference with contract and breach of contract.
In the spring of 1987 defendant Sussex County Municipal Utilities Authority (SCMUA) entered into a contract with plaintiff *162 East Penn Sanitation, Inc. for the disposal of solid waste collected in Sussex County. This contract was entered into without competitive bidding because of a garbage crisis resulting from the closing of a landfill. The contract provided for separate methods of waste disposal during different "phases" of performance thereunder. In Phase I plaintiff agreed to receive waste collected in Sussex County at a transfer station located in Pennsylvania pending completion of construction of the Sussex County transfer station. Although the parties originally contemplated that Phase I would last no more than twelve weeks, the anticipated commencement of operations of the Sussex County transfer station was delayed for a substantial period of time, which resulted in numerous amendments to the contract that eventually extended the end of Phase I to July 15, 1988. In Phase II, which was scheduled to last for a term of twelve months, plaintiff agreed to transport waste from the Sussex County transfer station to a final disposal site. When plaintiff entered into this contract, it was not licensed by either the Department of Environmental Protection (DEP) or the Board of Public Utilities (BPU).
On November 4, 1987, defendant Peter Cofrancesco, Jr., President of defendant Grinnell Haulers, Inc. (Grinnell), informed the SCMUA's commissioners in a closed executive session that he was interested in transporting waste from the Sussex County transfer station at lower rates than would be charged by plaintiff. By letter dated November 17, 1987, the SCMUA Chairman, John Carroll, informed the County Freeholder Director that, in response to proposals from several trucking and disposal companies, SCMUA counsel Edward Buzak had considered the legal ramifications of negotiating with another hauler and had concluded that the SCMUA's contract with plaintiff was valid. Consequently, the SCMUA could not withdraw from the contract without incurring a risk of suit. Buzak also concluded that, absent an emergency, public bidding would be required before a contract could be awarded to another party.
*163 In late November of 1987, a freeholder sent a memo to Carroll which asserted that plaintiff would have to obtain licenses from both the DEP and BPU in order to perform Phase II of the contract, and that members of the DeLorenzo family, who were plaintiff's principals, were barred from doing business in New Jersey. After receiving this memo, the SCMUA directed Buzak to determine whether plaintiff was licensed by the DEP and BPU, and if not, whether this would prevent plaintiff from performing its obligations under the contract. Based on conversations with representatives of the DEP and BPU, Buzak discovered that although neither plaintiff nor its principals were barred from doing business in New Jersey, they in fact lacked both a BPU certificate of public convenience and necessity and a DEP solid waste registration. Buzak reported these findings to the SCMUA and also expressed the opinion that because of the history of alleged environmental violations at High Point Sanitation, a landfill owned by the DeLorenzos, "it would be very difficult, if not impossible, for [plaintiff] to obtain either of those licenses." Based on his conversations with BPU and DEP representatives, Buzak also advised the SCMUA that plaintiff could complete performance under the contract by subcontracting the hauling part of the work to a licensed hauler.
Thereafter, Grinnell and Cofrancesco continued to communicate with SCMUA and Sussex County officials regarding Grinnell's interest in hauling waste from the Sussex County transfer station to a disposal site. These defendants also questioned plaintiff's qualifications to perform Phase II of the contract in light of its lack of licensure by either the DEP or BPU. In addition, Grinnell sent a letter to the BPU objecting to the SCMUA's application for a solid waste franchise based on plaintiff's lack of a certificate of public convenience and necessity. These communications, which are the basis of plaintiff's tortious interference claims against Grinnell and Cofrancesco, are discussed in section III of this opinion.
*164 At a meeting with Buzak in early March of 1988, the BPU's representatives expressed doubt as to whether plaintiff could perform Phase II by subcontracting with a licensed hauler. Around this same time, the DEP took the position that plaintiff needed an approved registration before it could subcontract or assign the contract.
After learning of these changes in position on the part of the DEP and BPU, the SCMUA authorized the filing of a declaratory judgment action to determine whether plaintiff had the legal authority to perform Phase II and also authorized the solicitation of bids for a new contract for the work plaintiff was scheduled to perform under Phase II. This solicitation notified potential bidders that the SCMUA's acceptance of any bid would be contingent upon the outcome of the declaratory judgment action. Grinnell submitted the low bid in response to this solicitation.
The trial court in the declaratory judgment action concluded that plaintiff did not need to obtain a certificate of public convenience and necessity from the BPU in order to perform Phase II[1] but that it did need to obtain a registration statement and solid waste transporters' license from the DEP. The court also concluded that plaintiff could not circumvent these requirements by subcontracting or assigning the contract to another party. However, the court further determined that plaintiff should be afforded *165 a reasonable opportunity to obtain a registration and license from the DEP. Accordingly, the court ordered plaintiff to submit an application to the DEP no later than May 23, 1988. The court ordered the SCMUA to "cooperate to the extent possible in facilitating approval of [plaintiff's] application." The declaratory judgment also provided that "in the event that the NJDEP disapproves [plaintiff's] application," the SCMUA shall be excused from performance of Phase II of the Contract. The judgment further provided that if the DEP failed to take "final action" by June 30, 1988, the parties should return to the court on July 1, 1988 "for further disposition."
Plaintiff apparently submitted a timely application with the DEP, and at plaintiff's request, the SCMUA's Executive Director submitted a letter indicating that its experience with plaintiff had been "satisfactory." However, the SCMUA's representatives also sent several other letters to the DEP which plaintiff alleges were in violation of the SCMUA's obligation to "cooperate" with plaintiff's application. These communications are one of the grounds of plaintiff's claims against the SCMUA and are discussed in greater detail in section II of this opinion.
Since it ordinarily takes more than a year for the DEP to process an application for permanent registration, plaintiff applied for both temporary and permanent registrations. On June 29, 1988, the DEP denied plaintiff's application for temporary registration, concluding that plaintiff had failed to show, as required by N.J.A.C. 7:26-16.5(c), that a temporary registration was "necessary to prevent or ameliorate a hazard to the public health, safety, or the environment; to prevent economic hardship to a public body, or otherwise serve[] some interest of the general public." The DEP also indicated that it would continue to process plaintiff's application for a permanent registration. Plaintiff did not appeal the DEP's denial of its application for temporary registration.
A week later, plaintiff asked the SCMUA to consent to the assignment of its rights and obligations under Phase II of the *166 contract to Polumbo Carting Company (Polumbo), which was a hauler licensed by the DEP. Plaintiff asserted that the SCMUA was authorized to give such consent in accordance with a consent order the trial court had entered on June 28, 1988, staying the part of the declaratory judgment which determined that plaintiff could not perform Phase II by an assignment to a licensed hauler.
On July 6, 1988, the SCMUA adopted a resolution refusing to consent to the assignment based on concerns as to whether the assignment would satisfy DEP registration requirements. This administrative action is one of the grounds of plaintiff's breach of contract claim against the SCMUA and is discussed in greater detail in section II of this opinion. At the same meeting, the SCMUA voted to award Grinnell the contract to transport waste from the Sussex County transfer station.
On July 8, 1988, the trial court in the declaratory judgment action entered a further order which provided that the SCMUA could "carry out Phase II of the Contract by use of a party other than [plaintiff], and [the SCMUA] shall have no liability to [plaintiff] or otherwise under Phase II of the Contract." However, the order further provided that "nothing in this judgment shall be construed to preclude [plaintiff] from filing an action against the [SCMUA] or others for conduct subsequent to the May 14, 1988 Judgment."
Plaintiff appealed from the part of the May 14, 1988 judgment which declared that it had to be licensed by the DEP in order to assign its interest in Phase II of the contract to a licensed hauler. The SCMUA appealed from the part of the July 8, 1988 order which preserved plaintiff's right to pursue an action for money damages for the SCMUA's conduct subsequent to May 14, 1988. We consolidated the appeals and affirmed the challenged portions of the declaratory judgment and post judgment order in an unreported opinion. Sussex County Municipal Utilities Auth. v. East Penn Sanitation, Inc., A-5082-87T2, A-6253-87T2 (decided March 22, 1989).
*167 The present action was commenced by a complaint filed by Polumbo, the hauler to which plaintiff attempted to assign the contract with the SCMUA, against Grinnell and the SCMUA. Plaintiff, which was brought into the action by the SCMUA's third party complaint, subsequently filed counterclaims and cross claims against the SCMUA and Grinnell. After the trial court dismissed Polumbo's complaint, leaving only plaintiff's claims for adjudication, plaintiff filed an amended complaint which added Cofrancesco as a defendant.[2]
In this amended complaint, plaintiff alleged that the SCMUA had tortiously interfered with its contractual relations and breached the contract by "undermining, sabotaging, and poisoning" plaintiff's application to the DEP for a temporary registration and license and by refusing to consent to plaintiff's request to assign its rights and obligations under Phase II. Plaintiff also alleged that Grinnell and Cofrancesco had tortiously interfered with its contractual relations by pressuring the SCMUA to breach the contract.
After a twenty-six day trial, a jury found that Grinnell and Cofrancesco had tortiously interfered with plaintiff's contractual relations with the SCMUA, and that the SCMUA had tortiously interfered with plaintiff's economic advantage and had breached the covenant of good faith and fair dealing implied in its contract with plaintiff. The jury awarded $1,875,000 in damages, allocating 35% to Grinnell, 20% to Cofrancesco and 20% to the SCMUA for tortious interference, and additional 25% to the SCMUA for breach of contract. The court denied defendants' motions for a judgment notwithstanding the verdict or, alternatively, for a new trial and entered a judgment memorializing the jury verdict. Since plaintiff had punitive damage claims against Grinnell and *168 Cofrancesco which had not been presented to the jury at trial, the trial court certified the judgment as final as to the SCMUA only.
The SCMUA, and Grinnell and Cofrancesco, filed separate notices of appeal. Since the judgment had not been certified as final with respect to Grinnell and Cofrancesco, we granted their motion for leave to appeal and consolidated the appeals. We also granted the DEP leave to participate in the appeal as amicus curiae.
In its appeal, the SCMUA argues that plaintiff's tortious interference claims should have been dismissed because a party to a contract cannot be held liable in tort for interfering with its own contract and because the Tort Claims Act provides immunity for this kind of claim. The SCMUA also argues that plaintiff failed to present any evidence to support a jury finding that it breached any express or implied obligation under the contract. In addition, the SCMUA argues that the trial court committed various errors with respect to the admission of evidence, cross-examination of witnesses, instructions to the jury and molding of the jury verdict.
We conclude that the SCMUA was not subject to tort liability for its actions relating to the contract with plaintiff because a party cannot tortiously interfere with its own contract. We also conclude that plaintiff did not present any evidence which would support a jury finding that the SCMUA breached the contract. Accordingly, we reverse the judgment and dismiss the complaint against the SCMUA. This disposition makes it unnecessary for us to consider the SCMUA's argument that the Tort Claims Act provides immunity for a tortious interference claim and its various arguments relating to the conduct of the trial.
On their appeal, Grinnell and Cofrancesco argue that Phase II of the contract between plaintiff and the SCMUA was invalid and unenforceable because plaintiff was not licensed by the DEP or the BPU, that the trial court erroneously instructed the jury regarding Cofrancesco's personal liability and that the court failed to instruct the jury that Grinnell and Cofrancesco had a qualified *169 privilege to communicate with the SCMUA and the Sussex County Board of Freeholders.
We conclude that even assuming that the contract between plaintiff and the SCMUA was not void ab initio, Grinnell's and Cofrancesco's communications of truthful information to the SCMUA and Sussex County Board of Freeholders regarding plaintiff's lack of the licenses required to perform Phase II of the contract could not form the basis for a finding of the "malice" required to support a verdict for tortious interference with contract. We also conclude that there was no evidence which could support a jury finding that Grinnell's and Cofrancesco's other activities were a proximate cause of the SCMUA's termination of its contract with plaintiff. Therefore, the verdict against Grinnell and Cofrancesco must be reversed. This conclusion makes it unnecessary for us to consider these defendants' other arguments.

I
"Tortious interference developed under common law to protect parties to an existing or prospective contractual relationship from outside interference." Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 752, 563 A.2d 31 (1989). Thus, "it is fundamental to a cause of action sounding in tortious interference with contractual obligations that the claim be directed at a third party." Kopp, Inc. v. United Technologies, Inc., 223 N.J. Super. 548, 559, 539 A.2d 309 (App.Div. 1988). "Where a person interferes with the performance of his or her own contract, the liability is governed by principles of contract law." Printing Mart-Morristown v. Sharp Electronics Corp., supra, 116 N.J. at 753, 563 A.2d 31.
Applying these principles, we are satisfied that the trial court erred in submitting plaintiff's claim that the SCMUA had tortiously interfered with its own contract to the jury. Plaintiff's claims against the SCMUA for interfering with its license application to the DEP and for wrongfully refusing to consent to the assignment of its rights and duties under the contract were simply *170 claims for breach of the contract. Therefore, the verdict against the SCMUA predicated on its alleged tortious interference with plaintiff's performance of the contract must be reversed.

II
Plaintiff contended that the SCMUA breached the contract in two separate ways: first, by sending letters to the DEP which "sabotaged" plaintiff's application for registration, and second, by unreasonably refusing to consent to the assignment of the contract to Polumbo. Since the trial court did not separate these claims in submitting the case to the jury, it is impossible to determine from the verdict whether the jury found in plaintiff's favor on both claims or only one. Consequently, if the evidence were insufficient to justify the submission of either of plaintiff's breach of contract claims to the jury, the verdict would have to be set aside and the case retried with respect to the other claim. However, we conclude that plaintiff's proofs were insufficient with respect to both claims and that the verdict against the SCMUA must be reversed outright.
Plaintiff did not contend that the SCMUA breached any express provision of the contract. Instead, plaintiff contended that the SCMUA's actions constituted breaches of an implied covenant of good faith and fair dealing.
"[E]very contract" has "an implied covenant of good faith and fair dealing," Onderdonk v. Presbyterian Homes of N.J., 85 N.J. 171, 182, 425 A.2d 1057 (1981), which "applies to the parties' performances and their enforcement of the contract." Sons of Thunder, Inc. v. Borden, Inc., 285 N.J. Super. 27, 49, 666 A.2d 549 (App.Div. 1995). However, "an implied obligation of good faith and fair dealing does not and cannot `alter the terms of a written contract.'" Id. at 50, 666 A.2d 549 (quoting Rudbart v. North Jersey Dist. Water Supply Comm'n, 127 N.J. 344, 366, 605 A.2d 681, cert. denied, 506 U.S. 871, 113 S.Ct. 203, 121 L.Ed.2d 145 (1992)). Moreover, this obligation does not require a party to a contract "to overlook its own rights under the agreement to *171 protect its property interests because such action is detrimental to the other party's interests." Liqui-Box Corp. v. Estate of Elkman, 238 N.J. Super. 588, 600, 570 A.2d 472 (App.Div.), certif. denied, 122 N.J. 142, 584 A.2d 214 (1990).
Plaintiff's claim that the SCMUA breached its duty of good faith and fair dealing by "sabotaging" plaintiff's application to the DEP is based on a series of communications from SCMUA representatives to the DEP during the period that plaintiff's application was being reviewed. Before discussing those communications, it is appropriate to outline the nature of the DEP licensing process and the DEP's and SCMUA's responsibilities thereunder.
The Solid Waste Management Act (SWMA), N.J.S.A. 13:1E-1 to -207, provides that "no person shall hereafter engage or continue to engage in the collection or disposal of solid waste in this State without first filing a registration statement and obtaining approval thereof from [the DEP]." N.J.S.A. 13:1E-5(a). Any transportation of solid waste within New Jersey is considered to be solid waste collection which requires an approved registration statement. N.J.A.C. 7:26-3.2. The licensing provisions of the SWMA were supplemented by chapter 392 of the Laws of 1983, sometimes referred to as the "A-901 statute," which was enacted for the purpose of excluding persons from the solid and hazardous waste industries who have "known criminal records, habits or associations" or who are "so deficient in reliability, expertise, or competence ... that [their] participation would create or enhance the dangers of unsound, unfair, or illegal practices, methods, and activities in ... these industries." N.J.S.A. 13:1E-126. An applicant for a registration statement must now submit a comprehensive disclosure statement to the DEP and the Attorney General which includes not only a list of any notice of violations, prosecutions, order or license revocations arising out of any solid waste or hazardous waste business, N.J.S.A. 13:1E-127(e)(5), but also "[a] description of the [applicant's] experience and credentials" in such business, N.J.S.A. 13:1E-127(e)(4), and "[a]ny other information the Attorney General or the [DEP] may require that relates to the *172 competency, reliability or good character of the applicant." N.J.S.A. 13:1E-127(e)(9); see N.J.A.C. 7:26-16.1 to 16.24. In addition, the "A-901 statute" confers broad authority upon the Attorney General to issue investigative interrogatories and subpoenas to any person who may have information relevant to an investigation of an applicant for a license. N.J.S.A. 13:1E-129, 130.
Plaintiff applied to the DEP for a temporary registration, which may be issued only if the DEP determines it is "necessitated by the public interest." N.J.S.A. 13:1E-135.[3] To implement its authority under this subsection, the DEP has adopted a regulation which provides in pertinent part that the agency may "[i]n its discretion" issue a temporary registration "to prevent or ameliorate a hazard to the public health, safety or the environment; to prevent economic hardship to a public body; or [to] serve[] some [other] interest of the general public." N.J.A.C. 7:26-16.5(c); see In re Stream Encroachment Permit No. 12400, 231 N.J. Super. 443, 457-59, 555 A.2d 1123 (App.Div. 1989). The record contains uncontroverted evidence that the DEP relies heavily upon information provided by local governmental agencies responsible for waste disposal in determining whether an applicant has satisfied the strict criteria for issuance of a temporary registration. Therefore, these local agencies must provide the DEP with accurate and complete information relevant to an applicant's eligibility for a temporary registration in order for the DEP to discharge its responsibilities under the SWMA and the regulations implementing this legislation.
Our courts have recognized, in various contexts, that the need of public agencies to obtain information relevant to the performance of their statutory responsibilities may require the sources of such information to be shielded from liability for damages. See, e.g., Rainier's Dairies v. Raritan Valley Farms, Inc., 19 N.J. 552, 558-63, *173 117 A.2d 889 (1955); Brien v. Lomazow, 227 N.J. Super. 288, 309, 547 A.2d 318 (App.Div. 1988). The need for the free flow of information unrestrained by any fear of potential liability is especially strong with respect to communications between governmental agencies with overlapping responsibilities to serve the public interest. Therefore, the public interest in enforcement of the SWMA precludes a finding that the SCMUA breached its duty of good faith and fair dealing by simply disclosing accurate information to the DEP relevant to plaintiff's eligibility for a registration statement.
The communications upon which plaintiff based its claim that the SCMUA breached the contract by "sabotaging" plaintiff's application for a registration statement consisted of truthful statements relevant to the DEP's evaluation of the application. Initially, we note that the SCMUA's executive director sent a letter for inclusion with plaintiff's application which reported that the SCMUA's "experience" with plaintiff had been "satisfactory." Although plaintiff acknowledges that this letter was supportive of its application, plaintiff contends that subsequent communications from the SCMUA's representatives to the DEP undermined the application.
The first such communication, which was sent by the SCMUA's counsel on June 3, 1988 after plaintiff had filed an incomplete application, stated in pertinent part:
As a result of a ruling by Judge Stanton on May 4, 1988 (embodied in an Order entered May 14, 1988), a determination was made by the Court that [plaintiff] needed to file with and have approved by the [DEP] a Registration Statement in order to operate under Phase II of the Contract, which involves the collection of the solid waste from the Authority's transfer station and the haulage thereof to landfills out of the State of New Jersey.
To implement his Order, Judge Stanton required that an application for the Registration be filed by May 23, 1988 and anticipated that the NJDEP would be acting on the application not later than June 30, 1988.
From discussion that I had with you and from correspondence received, it appears that a partially complete application was submitted by May 23, 1988, but that the actual statement executed by Gregory DeLorenzo was not submitted to you. Instead, an old form was completed, but neither signed nor notarized. Mr. DeLorenzo was out of the Country and was supposed to execute the actual *174 application on or about May 26, 1988. We are now advised that he will not be back from his trip for another ten days and that execution thereof cannot take place until June 6, 1988.
Additionally, I had occasion to speak to Ross Lewin, Deputy Attorney General, in connection with the matter, who advised me that under the best of circumstances it was highly unlikely that a decision could be reached by June 30, 1988. The failure to reach a final decision in this matter by that date would result in severe economic hardship on the Authority as its transfer station remains standing and ready for operation, but inoperable because the hauler, [plaintiff], does not possess the requisite registration approval.
It is my understanding that an immediate review can be made of the application on the issue of whether there is some disqualification of the applicants on the face of the application. If it is determined that there is such a disqualification, the license can be denied and the parties can proceed. Judge Stanton ruled that if the application is denied, then the Authority is excused from performance under the contract and can proceed to contract with others to perform the same services. Of course, if a registration was approved, [plaintiff] would move into the second phase of the contract. Based upon the foregoing, we would respectfully request that an immediate determination be made on the face of the applications as to whether there is a disqualification that would bar the issuance of the registration. If so, we would ask that that determination be made forthwith so that the Authority can proceed to make other arrangements for the operation of its transfer station.
We perceive nothing in this letter which could support a jury finding that the SCMUA breached its duty of good faith and fair dealing under its contract with plaintiff. The SCMUA had a substantial interest in the DEP rendering an early decision on plaintiff's application because the Sussex County transfer station was scheduled to commence operations in early July and the SCMUA needed to know before then whether plaintiff would be allowed to haul waste from this facility. To expedite the review of plaintiff's application, the Buzak letter simply noted that even though the application was deficient because it did not contain Gregory DeLorenzo's notarized signature, the DEP still could conduct a preliminary review to determine whether there was any disqualification apparent on the face of the application. Buzak's suggestion that the DEP review that application for any obvious disqualifying circumstances was purely procedural and cannot reasonably be read as a request by the SCMUA to the DEP to deny the application.
*175 The second communication upon which plaintiff relies is a letter dated June 15, 1988, sent by the SCMUA's Chief Engineer under the name of the SCMUA's Chairman in response to an inquiry from the DEP, which states:
Please be advised that the SCMUA has a registered hauler licensed by the State of New Jersey available to transport solid waste from the Authority's Temporary Transfer Station located in Lafayette Township.
Grinnell Haulers, Inc. submitted the low bid of $77.90 per ton for the transportation and disposal of solid waste on April 13, 1988. This contract cannot be awarded until a determination has been made by NJDEP on [plaintiff's] application for a license.
If the low bid submitted by Grinnell Haulers, Inc. is awarded, a substantial cost savings will be realized by the SCMUA.
Although this letter indicates that the SCMUA would derive a financial benefit from accepting Grinnell's bid rather than proceeding with Phase II of its contract with plaintiff, the information provided therein was accurate and clearly relevant to the DEP's determination of whether plaintiff had satisfied any of the prerequisites for the issuance of a temporary registration under N.J.A.C. 7:26-16.5(c). In fact, there is undisputed evidence that the DEP would not have acted upon plaintiff's application for a temporary registration without first ascertaining whether the SCMUA had made alternative arrangements for the disposal of waste brought to its transfer station in the event the application was denied.
The third communication upon which plaintiff relies is a letter dated June 24, 1988, from the SCMUA engineer, also sent in response to an inquiry from the DEP, which states in pertinent part:
This will confirm our telephone conversation of June 24, 1988 at which time the following information was provided in conjunction with the bids received by the SCMUA on April 13, 1988 for the Transportation and Disposal of Solid Waste from the Temporary Transfer Station.

 BIDDERS LIST AMOUNT OF BID - $ PER TON
 Grinnell Haulers, Inc. $77.90
 National Transfer, Inc. $79.50
 Newark Disposal Service, Inc. $84.00
 National Waste Disposal, Inc. $92.32

The question on whether all of the above bidders presently hold a valid NJDEP license to haul solid waste should be verified within your Department.
*176 It is clear that this letter not only provides accurate information relevant to the DEP's determination of whether to grant plaintiff's application for a temporary registration but that it was sent in direct response to the DEP's request for a list of bidders and the amounts of their bids.
In short, the SCMUA had a duty to provide the DEP with accurate and complete information relevant to plaintiff's eligibility for a temporary registration. In addition, the SCMUA had a legitimate interest in encouraging the DEP to reach a decision on plaintiff's application as quickly as possible, because the Sussex County transfer station was scheduled to commence operations within a short period of time and the SCMUA needed to know whether plaintiff would be allowed to haul waste from this facility. All the communications from SCMUA's representatives to the DEP during the period the DEP was reviewing plaintiff's application were reasonably related to the SCMUA's discharge of these responsibilities. Furthermore, plaintiff clearly failed to qualify for a temporary registration under N.J.A.C. 7:26-16.5(c), because there is no evidence that the issuance of such a registration was required "to prevent or ameliorate a hazard to the public health, safety or the environment; to prevent economic hardship to a public body; or [to] serve[] some [other] interest of the general public."[4] In fact, it appears that the only way plaintiff could have obtained a temporary registration was if the SCMUA had provided inaccurate or misleading information to the DEP concerning the availability of alternative arrangements for the transportation of waste from the Sussex County transfer station in the event plaintiff's application was denied. Such a communication would have been inconsistent with the SCMUA's responsibilities under the SWMA and the A-901 statute and could have even subjected *177 the person making the communication to prosecution under N.J.S.A. 2C:28-3b(1). Therefore, the SCMUA's communications to the DEP regarding plaintiff's eligibility for temporary registration could not constitute a breach of the SCMUA's duty of good faith and fair dealing.[5]
Plaintiff's other breach of contract claim, that the SCMUA wrongfully refused to consent to the assignment to Polumbo, is based on the premise that the refusal to consent to the assignment of a contract solely for reasons of economic self-interest  in this case, the SCMUA's opportunity to contract with Grinnell at a lower price than its contract with plaintiff  constitutes a breach of the implied duty of good faith and fair dealing. As support for this premise, plaintiff cites Ringwood Assocs., Ltd. v. Jack's of Route 23, Inc., 153 N.J. Super. 294, 379 A.2d 508 (Law Div. 1977), aff'd 166 N.J. Super. 36, 398 A.2d 1315 (App.Div. 1979), in which the court stated that "[t]he fact that the lessor could obtain a higher rent under a new lease agreement but not under an assignment of defendant's lease did not justify the lessor's refusal to consent to the assignment." 153 N.J. Super. at 303, 379 A.2d 508. However, the lease involved in Ringwood Associates specifically provided that the landlord's consent to an assignment "shall not be unreasonably withheld." Id. at 299, 379 A.2d 508. When this restriction upon a landlord has been omitted from a lease, we have held that a landlord is not subject to an implied duty of commercial reasonableness in exercising its right to refuse consent to the *178 assignment of a lease. Brower v. Glen Wild Lake Co., 86 N.J. Super. 341, 345-46, 206 A.2d 899 (App.Div.), certif. denied, 44 N.J. 399, 209 A.2d 139 (1965); see also 3 Williston on Contracts, § 411 at 18-19 (3d ed. 1960) ("The duties under a contract are not assignable inter vivos in a true sense under any circumstances; that is, one who ... is bound to any performance whatever, cannot by any act of his own, or by any act in agreement with any other person, except his creditor, divest himself of the duty and substitute the duty of another.") Therefore, the mere fact that the SCMUA's refusal to consent to the assignment of the contract to Polumbo furthered the SCMUA's economic interests does not mean that this action constituted a breach of the SCMUA's duty of good faith and fair dealing.
In any event, even if the SCMUA were subject to a duty of commercial reasonableness in determining whether to consent to plaintiff's assignment of its rights and duties under the contract, and the pursuit of the economic interests of the SCMUA and the residents of Sussex County in obtaining a lower price for hauling waste were deemed to be unreasonable, we are satisfied that the SCMUA had other valid reasons for refusing to consent to the assignment. When the SCMUA passed its resolution, the DEP not only had denied plaintiff's application for a temporary registration but had taken the firm position that plaintiff could not perform its obligations under the contract by an assignment to a licensed hauler. Moreover, the trial court had concurred with this position. Although the trial court temporarily stayed its decision pending appeal, this stay was not binding upon the DEP, because the DEP was not a party to the declaratory judgment action and the trial court would not have had jurisdiction to review the administrative action of the DEP. R. 2:2-3(a)(2); see Kohlbrenner Recycling Enterprises v. Burlington County Bd. of Freeholders, 248 N.J. Super. 531, 591 A.2d 962 (App.Div.), certif. denied, 127 N.J. 551, 606 A.2d 364 (1991). Consequently, even if the temporary stay entered by the trial court had remained in effect, the SCMUA would have had a continuing exposure to a DEP enforcement action seeking injunctive relief and/or penalties under *179 N.J.S.A. 13:1E-9 based upon the SCMUA's use of an unlicensed party to transport waste from the transfer station. Furthermore, if the DEP had agreed to withhold any enforcement action pending the outcome of plaintiff's appeal, the SCMUA's use of plaintiff's assignee, Polumbo, to haul waste from the Sussex County transfer station would have been subject to summary termination in the event the declaratory judgment were affirmed during the term of the contract.[6] Therefore, the avoidance of exposure to a DEP enforcement action and the elimination of uncertainty regarding the availability of a licensed hauler to transport waste from the Sussex County transfer station to a final disposal site provided a reasonable basis for the SCMUA's refusal to consent to the assignment of performance under Phase II.
Accordingly, we conclude that the SCMUA did not breach the duty of good faith and fair dealing implied in its contract with plaintiff either by its communication of complete and accurate information to the DEP regarding plaintiff's application for temporary registration or by its refusal to consent to the assignment of plaintiff's rights and duties under Phase II.

III
We turn finally to the verdicts against Grinnell and Cofrancesco for tortious interference with contract. Plaintiff's claims against Grinnell and Cofrancesco were based primarily on their actions in informing the SCMUA and the Sussex County Board of Freeholders (the Board) that plaintiff lacked the licenses required to perform Phase II and that plaintiff could not satisfy its contractual obligations by subcontracting or assignment.
One essential element of a cause of action for tortious interference with a contract is "malice," which requires a showing not only that the interference was done "intentionally" but also *180 that it was "without justification or excuse." Printing Mart-Morristown v. Sharp Electronics Corp., supra, 116 N.J. at 751, 563 A.2d 31. Thus, it is generally recognized that a party may not be held liable for tortious interference for merely providing truthful information to one of the contracting parties. Restatement (Second) of Torts § 772(a) (1977) ("One who intentionally causes a third person not to perform a contract ... does not interfere improperly with the other's contracted relation, by giving the third person truthful information"); C.R. Bard, Inc. v. Wordtronics Corp., 235 N.J. Super. 168, 173-74, 561 A.2d 694 (Law Div. 1989) ("It is not improper to give truthful information to a customer about someone else's product, and this is so even if the purpose is to interfere with an existing or prospective contractual relationship"); Liebe v. City Finance Co., 98 Wis.2d 10, 295 N.W.2d 16, 18 (Ct.App. 1980) ("[T]he transmission of truthful information is privileged, does not constitute improper interference with a contract, and cannot subject one to liability for tortious interference with a contract"); Contra Pratt v. Prodata, Inc., 885 P.2d 786, 790 (Utah 1994). It is also generally recognized that it is not tortious interference to cause "the nonperformance of an illegal agreement or an agreement having a purpose or effect in violation of an established public policy." Restatement (Second) of Torts, § 774; see also Middlesex Concrete Prods. & Excavating Corp. v. Carteret Indus. Ass'n, 37 N.J. 507, 518, 181 A.2d 774 (1962) ("Protection of the public interest has been recognized ... as affording privilege to acts of interference"); compare Harris v. Perl, 41 N.J. 455, 461, 197 A.2d 359 (1961) (quoting Prosser, Torts § 106, p. 726 (2d ed. 1955)) (noting that "contracts which are voidable by reason of the statute of frauds, formal defects, lack of consideration, lack of mutuality, or even uncertainty of terms, still afford a basis for a tort action when the defendant interferes with their performance.")
Applying these principles, we conclude that Grinnell's and Cofrancesco's communications to the SCMUA and the Board regarding plaintiff's alleged incapacity to perform Phase II could *181 not support a finding of "malice." Since plaintiff did not have an approved solid waste registration statement or a certificate of public convenience and necessity, Grinnell's and Cofrancesco's actions in informing the SCMUA and the Board of this fact merely constituted the communication of "truthful information." Furthermore, even if Grinnell's and Cofrancesco's statements that these licenses were required to perform Phase II are viewed as expressions of legal opinion rather than as statements of fact, those statements simply precipitated administrative and judicial proceedings which resulted in a determination that plaintiff could not in fact legally perform the contract. Thus, Grinnell's and Cofrancesco's statements to the SCMUA and the Board resulted at most in the termination of a contract which plaintiff planned to perform by means that would have violated the SWMA. Therefore, even though Grinnell's and Cofrancesco's actions were undoubtedly motivated by economic self-interest, the communication of truthful information which ultimately promotes the State's public policy, as expressed in regulatory legislation such as the SWMA, cannot be found to have been made "without justification or excuse" and thus cannot support a finding of "malice." Printing Mart-Morristown, supra, 116 N.J. at 751, 563 A.2d 31.[7]
Insofar as plaintiff's tortious interference claim was based on Grinnell's and Cofrancesco's communication of other adverse information about plaintiff, such as that plaintiff allegedly was not disposing of waste in a "lined" landfill, there is no evidence that such information caused the termination of plaintiff's contract. Rather, as discussed in section II of this opinion, it is undisputed that the contract was terminated solely because plaintiff's application for a temporary registration was denied and the SCMUA refused to consent to assignment of plaintiff's rights and obligation under Phase II.
*182 In addition, there is no evidence that Grinnell's expression of interest in taking over the work plaintiff had contracted to perform was a proximate cause of the termination of the contract. It is undisputed that other contractors also had expressed interest in performing this work and that Grinnell was ultimately awarded the contract through competitive bidding. Therefore, there is no basis for a finding that any of Grinnell's or Cofrancesco's communications to the SCMUA and the Board, other than those providing truthful information regarding plaintiff's lack of licensure, were a proximate cause of the termination of the contract. See Printing Mart-Morristown v. Sharp Electronics, supra, 116 N.J. at 751, 563 A.2d 31.
Accordingly, the verdicts against Grinnell and Cofrancesco for tortious interference are reversed. In addition, since the jury's determination that Grinnell and Cofrancesco tortiously interfered with the contract between plaintiff and the SCMUA is the sole basis for plaintiff's punitive damage claim against these defendants, we exercise our original jurisdiction and dismiss that claim.
For the foregoing reasons, the judgment memorializing the jury verdict is reversed and plaintiff's complaint is dismissed.
NOTES
[1] This conclusion, which was based on the fact that the SCMUA was not then subject to the BPU's regulatory authority, was not challenged in the subsequent appeal from the declaratory judgment and is not before us on this appeal. We note, however, that N.J.S.A. 48:13A-6 prohibits any person from engaging in the business of solid waste collection or disposal without a certificate of convenience and necessity and that N.J.A.C. 7:26-1.6(c) (formerly N.J.A.C. 14:3-10.3(b)) provides that "[n]o person may bid for a solid waste collection contract or solid waste disposal contract with a ... political subdivision... unless that person is the holder of a certificate of public convenience and necessity." See Interstate waste Removal Co. v. Board of Commissioner of Bordentown, 140 N.J. Super. 65, 71-72, 355 A.2d 197 (App.Div. 1976). We also note that N.J.S.A. 48:13A-6.2, enacted in 1990 (L. 1990, c. 113, § 2), now clearly requires a certificate of convenience and necessity to be obtained before any transfer station may commence operations.
[2] Although the record before us does not include an order amending the caption, the pleadings and other papers submitted since the dismissal of Polumbo's complaint, including the judgment and the notices of appeal to this court, have all used a new caption naming East Penn Sanitation, Inc. as the sole plaintiff. Therefore, we have used this caption in our opinion.
[3] As a result of a 1991 amendment to the statute, L. 1991, c. 269, § 10, this provision may now be found in N.J.S.A. 13:1E-135(a)(2).
[4] Plaintiff presented several arguments relating to an internal DEP memorandum, dated June 20, 1988, which sets forth more detailed criteria to guide DEP staff with respect to the issuance of temporary registrations. However, since plaintiff clearly failed to satisfy any of the criteria for issuance of a temporary registration set forth in N.J.A.C. 7:26-16.5(c), we have no need to consider the status or validity of this internal memorandum.
[5] Plaintiff suggests that in addition to breaching its duty of good faith and fair dealing, the SCMUA violated the part of the judgment in the declaratory judgment action which required the SCMUA to "cooperate to the extent possible in facilitating [plaintiff's] application." However, we read this provision as simply requiring the SCMUA to cooperate with plaintiff in the submission of its application to the DEP by, for example, submitting any information relevant to the application in a timely manner. The declaratory judgment cannot be reasonably read to require the SCMUA to provide inaccurate or incomplete information to the DEP, or to abdicate its responsibilities to the citizens of Sussex County to secure a reliable party to transport waste from the transfer station.
[6] In fact, this court affirmed the declaratory judgment on March 22, 1989, five months before the contract with plaintiff would have expired if the SCMUA had consented to the assignment to Polumbo.
[7] Since the truthful information communicated in this case related to a matter of State public policy, we have no need to decide whether the communication of truthful information could support a claim for tortious interference under other circumstances.